UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

SHAHEED KHAN,

      Defendant.
----------------------------------------------------------------x

**MEMORANDUM AND ORDER**
06-cr-255 (DLI)

**DORA L. IRIZARRY, United States District Judge:**

  Before this court is a motion by the government requesting an order prohibiting the defendants' attorneys from making statements to the press in violation of Eastern District of New York Local Criminal Rule 23.1 ("Rule 23.1" or the "Rule"). Because the court finds that defense counsel Robert Simels ("Simels") made statements at a press conference that violate Rule 23.1 and, as a direct result, likely put numerous people and their families and friends in danger, the government's motion is granted. The text of the court's prohibition, which extends beyond Rule 23.1 and applies to all counsel, is set forth herein.

  Both parties also request to file their respective submissions concerning the instant matter under seal. The government's request is granted in part and denied in part, and Simels' request is denied.

**I. Background**

  Defendant Shaheed Khan ("Khan" or "Defendant") is a Guyanese national charged with multiple counts of distribution, importation, and possession of cocaine and engaging as a principal administrator, organizer, and leader of a continuing criminal enterprise in the Eastern District of New York and elsewhere. Defendant allegedly headed a powerful cocaine trafficking organization out

1

of Georgetown, Guyana. The government alleges that many of Defendant's co-conspirators still reside in Guyana.

On April 25, 2007, Simels held a press conference concerning this case in Georgetown, Guyana. The press conference was reported in Guyanese print newspapers, one of which, the government alleges, is available in New York City. (*See* Gov't. Letter 6.) These newspapers also disseminated the reports of the press conference on their Internet web sites, which are available in the Eastern District of New York. (*See* Gov't. Exs. A & B.) The government has provided the court with a redacted and unredacted transcript of the press conference, as well as a compact disc recording of the conference. (*See* Gov't. Exs. C & D.)

The government alleges that Simels' remarks made at the press conference violate Rule 23.1's prohibition against statements by counsel that interfere with a fair trial or otherwise prejudice the due administration of justice. Accordingly, the government requests that this court issue an order, pursuant to Rule 23.1(h), prohibiting the defendant's attorneys in this case from making statements to the press in violation of the Rule. Simels objects to the government's motion, asserting that "[a]t no point was there an intended violation of Rule 23.1" and that he had "absolutely no intent to impact on a prospective jury pool in the Eastern District of New York." (Simels' Letter 1.) He further states that it "strain[s] credulity" to assert that the jury pool in this district could be tainted by comments he makes to the press in Guyana. (Simels' Letter 1.)

To protect the identities of the individuals named therein, the government requests that its submission be filed under seal. Simels also requests that his submission be filed under seal.

## II. Statements to the Press

### A. Local Criminal Rule 23.1

Rule 23.1(a) states, in pertinent part that

> [i]t is the duty of the lawyer or law firm. . . not to release or authorize the release of non-public information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which they are associated, if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

Rule 23.1 prohibits only those statements that are "reasonably likely" to interfere with a fair trial or prejudice the due administration of justice. *U.S. v. Cutler*, 58 F.3d 825, 835 (2d Cir. 1995). Subsection (d) of the Rule outlines subject matters that "presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule," including statements concerning

> (4) [t]he identity, testimony or credibility of prospective witnesses, except that the lawyer or law firm may announce the identity of the victim if the announcement is not otherwise prohibited by law. . . (6) Information the lawyer or law firm knows is likely to be inadmissible at trial and would if disclosed create a substantial likelihood of prejudicing an impartial trial; and (7) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

Speech falling into the aforementioned categories presumptively violate Rule 23.1, although the presumption is rebuttable. *Cutler*, 58 F.3d at 836.

The court has authority, under Rule 23.1(h), to prevent violations of the Rule. Subsection (h) states that "[t]he court, on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury. . . and any other matters which the court may deem appropriate for inclusion in such order." Moreover, "[a]ny lawyer who violates the terms

3

of this rule may be disciplined pursuant to Local Civil Rule 1.5." Rule 23.1(i).

    **B.    Application**

Simels' statements made at the press conference in Guyana violated Rule 23.1. His comments clearly prejudiced the due administration of justice and potentially interfered with a fair trial. Simels violated Rule 23.1 by identifying prospective government witnesses. *See* Rule 23.1(d)(4). In addition, Simels attempted to publicly tarnish the credibility of the witnesses he identified, as well as commented at length on the merits of the case, his opinion concerning Defendant's guilt or innocence, the government's motives for indicting Defendant, and the evidence, some of which he knows or should know will be inadmissible at trial. *See* Rule 23.1(d)(4), (6)-(7).

    **1.    The Statements**

During the press conference, Simels repeatedly identified by name individuals, all of whom are Guyanese, whom he believes to be potential government witnesses or cooperators against Khan. (*See, e.g.*, Tr.[1] at 5, 8-10). As if that were not enough, Simels actually spelled out some of these individuals' names, to ensure that the assembled press corps could report them correctly. (*See* Tr. at 5.) In one instance, Simels even provided the name of a business in Guyana operated by the family of one of the alleged witnesses, thereby furthering the ability of the public to identify the witness and locate her family. (Tr. at 5.)

The loquacious Mr. Simels did not stop there. Instead, he commented at length about the credibility–or, better put, the lack thereof–of the witnesses he presumed the government would call. Simels stated outright that "these witnesses are lying." (Tr. at 8.) In addition, he characterized the

---

[1] "Tr." refers to the redacted transcript of the press conference, located in the government's Exhibit C.

witnesses generally as unreliable. For example, Simels stated,

> I think that the Guyanese government and the officials here who believe that the United States might be prosecuting Roger Khan properly should be aware of the nature of the people upon whom the United States is relying in this case. All of whom are convicted drug dealers. All of whom have sought to pervade the fabric of Guyana and the fabric of the United States with their activities. Yes, I think that a [redacted] like [redacted name], who took family members and made them couriers, and mules taking drugs to England and to the United States, ought to be unmasked for what [redacted] is; among other people.

(Tr. at 10.) Simels also identified the past testimony of government witnesses from trials not involving Khan, stating that "[w]e have looked at the past testimony of those witnesses, given under oath, as to who they believe the source of the drugs in Guyana might be. Not one witness has identified Roger Khan as being involved. Not one witness knew the name." (Tr. at 5.) He charged the government with "auditioning people hoping that one of them will say, 'Yes, Roger Khan was the person responsible,'" and concluded that any future testimony by these witnesses implicating Khan would only be because "they are prepared to lie and now say, 'Oh, yes, it was him.'" (Tr. at 11, 5.)

At one point, a press member asked, "Is it. . . usual for defense attorneys to go into the public domain, as you are arguing, identifying witnesses like [redacted name], [redacted name], [redacted name], [redacted name] and [redacted name] in an effort to either discredit those witnesses in the public domain, or is it so normal that it's just something you would do to make your case better?" (Tr. at 9.) Simels' response was that this was a "unique" case. (Tr. at 9.)

Simels made numerous other comments regarding the merits of the case, the evidence, his opinion regarding Khan's guilt or innocence, and the government's motives for indicting Defendant. For example, Simels alleged that the government "does not have a case against Roger Khan" and that this case was "politically motivated." (Gov't. Ex. A at 2; Tr. at 2.) He further claimed that "[t]here

5

is no fingerprint analysis; no voice print analysis; there is no scientific analysis whatsoever with regards to this case." (Gov't. Ex. B at 1; Tr. at 4-5.)

Regarding the prospective jury pool, Simels stated, "We are hoping that there are people who are his peers from the West Indian community and the like who will be called as part of the jury pool. . . . I'm not sure that we could do more than what I have tried to do with every jury which is to educate them and make them believe that the person who knows the most about the case is me. And to persuade them and to lead them in through the cross examination to show why these witnesses are lying and what they [*sic*] benefit is to them to lie." (Tr. at 8.) Simels later stated, "There. . . seems to me, a lot of misinformation that is imparted perhaps to the press and/or the public with regards to this case. I happen to be here and I was asked if I could indeed try to address some of these issues to straighten them out." (Tr. at 9-10.)

### 2. Interference with the Administration of Justice and a Fair Trial

Without any doubt, Simels' comments presumptively violate Rule 23.1 under subsection (d)(4), and he has failed to provide any evidence to rebut the presumption. Simels identified people he speculated would be government witnesses (the government has not yet released a witness list) and then attempted to smear their credibility. While a defense attorney may certainly endeavor to determine which witnesses may be called against his or her client in order to prepare a defense, there is no legitimate reason for Simels to broadcast to the press in Guyana the identities of people he believes to be government witnesses or cooperators, or to conduct a public smear campaign.

Defendant is charged with leading a major violent drug organization out of Guyana. He allegedly has many resources at his disposal, and many of his co-conspirators purportedly still reside in Guyana. Against this backdrop, Simels' statements appear to serve no purpose other than to

6

attempt to silence, intimidate, and harass the identified individuals and to put them and their families and friends, many of whom live in Guyana or within Guyanese communities in the United States, in danger. Cases abound in this district alone of suspected government cooperators who have been killed because of the perception–whether true or not–that they were cooperating. The government, in its papers, provide an example of a Guyanese individual who was gunned down, likely because of an unsubstantiated rumor that he was cooperating with the government in a case against a Guyanese cocaine trafficker. (*See* Gov't. Letter 5-6.)[2]

It is clear to this court that Simels' statements have jeopardized the safety of the individuals he named, as well as the safety of their friends and families. The court can think of no other conduct that would more fully interfere with the due administration of justice, within the meaning of Rule 23.1. Not only did Simels identify suspected government witnesses, he practically provided the press with a roadmap to some of their homes, spelling out names and identifying the family business in Guyana of one named individual.[3] Simels' comments to the Guyanese press ran so contrary to his obvious ethical duties that, at one point, even members of the press who were present at the conference questioned the propriety of Simels' remarks. It degrades the standards of this profession when a practitioner comports himself in such a reckless manner.

Furthermore, Simels' unbridled statements regarding the witnesses, the merits of the case,

---

[2]The court observes that, during the press conference, Simels stated with a degree of emphasis that "Roger Khan is not cooperating and is not going to be cooperating," perhaps revealing Simels' awareness of the danger involved in the perception of government cooperation in Defendant's illicit line of work. (*See* Tr. at 17.)

[3]This court recognizes and commends the restraint shown by the press members present at the conference in not disclosing the names of the individuals Simels identified as possible government witnesses.

Defendant's guilt or innocence, the prosecution's motives, and the potential evidence in the case, particularly evidence that would be inadmissible at trial, could potentially interfere with a fair trial in this matter. *See* Rule 23.1(d)(6)-(7). Simels claims that it "strain[s] credulity" to assert that the jury pool in this district could be tainted by comments he makes to the press in Guyana. This court has not strained itself in seeing the plausibility of such a notion. In this age of the Internet, it is not unreasonable to assume that information given to the press in Guyana may be disseminated via the Internet to our local community, thereby tainting the jury pool. In this particular instance, Simels' remarks were, in fact, disseminated via the Internet to this district; presumably, this is how the government became aware of the press conference. Moreover, at least one Guyanese newspaper that covered the press conference is apparently available in print locally.

It is important to bear in mind that our "local community" happens to be New York City, where the largest Guyanese population resides outside of Guyana. Clearly the Guyanese community is interested in this case, or Simels would not be holding well-attended press conferences in Guyana. The interest of the local Guyanese community in this matter is further evident to the court at almost every court conference for this case. The Guyanese press is usually present, as are several members of the Guyanese community, as well as Defendant's family members.

In considering this motion, the court visited the Internet and ran a "Google" search for Defendant's name. Over two thousand "hits" came up, not all of which, of course, were related to the Defendant. Nonetheless, many were related to him–there were "blogs" about this case, as well as news stories on informal and formal news web sites, such as the ones brought to the court's attention by the government. Furthermore, there were news web sites reporting on Defendant and this case targeting the Jamaican population and the West Indian population in general, as well as

sites in Spanish targeting the Latin American community, specifically South Americans. There was even a Cuban site concerned with this case. This is not the isolationist America of Woodrow Wilson. We live in a global community. People from Latin America, from the Caribbean and elsewhere have an interest in what happens in neighboring countries. Moreover, we have immigrants, residents, and descendants from these countries in the United States, especially in the various boroughs and surrounding areas of New York City, several of which fall within this district. Many of these people maintain a strong interest in events occurring in their home countries, or countries of descent. It is therefore not a stretch, in this court's view, to believe that remarks made by Simels in Guyana may well reach and influence our richly diverse jury pool in this district. At the very minimum, there can certainly be no *per se* rule that statements made to members of a foreign press will not impact the jury pool here.

Although Simels claims that "there was absolutely no intent to impact on a prospective jury pool," the transcript of the press conference belies his claim. Simels himself expressed his hope and the possibility that members of the "West Indian community and the like" would be a part of the jury and then plainly stated that he was trying to "educate" the jury. He further expressed his concern about "a lot of misinformation that is imparted perhaps to the press and/or the public with regards to this case," which he said he wanted to "straighten. . . out." Simels' own words reflect that his statements were aimed at potential jury members.

However, whether it is "reasonably likely," under the Second Circuit's *Cutler* standard, that Simels' comments at the press conference interfered with a fair trial by tainting the jury pool is a question the court declines, at present, to address in light of the fact that a trial date has not yet been set. *See* 58 F.3d at 835. Suffice it to say, however, that this court sees no insurmountable obstacle

9

in the possibility of so finding, should the need arise.

### 3. The Court's Prohibition and Caution to All Counsel

Based on the foregoing analysis, the court issues the following prohibition. All counsel of record in this case are prohibited from making any statement, whether in the United States or elsewhere, that involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of Local Criminal Rule 23.1. In particular, counsel are prohibited from making statements concerning (1) the identity, testimony, or credibility of prospective or possible government witnesses, (2) information counsel know is likely to be inadmissible at trial and would, if disclosed, create a substantial likelihood of prejudicing an impartial trial; and (3) any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case, if such statements are reasonably likely to interfere with a fair trial or the administration of justice.

Although the foregoing prohibition in large part tracks the language of Rule 23.1, the court emphasizes that its prohibition goes beyond the Rule, to the extent that counsel are prohibited from making statements concerning the identity, testimony, or credibility of prospective or *possible* government witnesses. This court is mindful of its obligation to ensure that its prohibition "does not constitute a forbidden intrusion on the field of free expression," but also its equally important obligation to protect the due administration of justice. *See Gentile v. State Bar*, 501 U.S. 1030, 1038 (1991). In regard to the latter obligation, the court has serious concerns that the mere mention of the names of any potential or possible witnesses may compromise their safety and the safety of their family and friends, as well as chill the desire or willingness of these individuals–or of other possible witnesses–to testify. Such concerns justify the limited constraint on counsels' speech imposed by

the court's foregoing prohibition.

Although this court also has the power, under Rule 23.1(i), to impose sanctions on Simels for his statements made in violation of Rule 23.1, this court chooses not to do so at this time. Instead, all counsel are put on formal notice that any violation of the court's foregoing prohibition or of Rule 23.1 shall result in a finding of contempt, the imposition of sanctions, and/or possible action by this court's grievance committee.

## III. Simels' Internet Web Site

During the press conference, members of the Guyanese press observed that Simels, on his Internet web site, has listed the instant case in such a manner as to suggest he has already prevailed. (*See* Tr. at 12.) One press member further identified additional information on Simels' web site that the press member felt was misleading. (*See* Tr. at 12.) The court took the liberty of visiting Simels's web site to review the press member's assertions. (*See* http://www.simelslaw.com.[4]) On the page entitled "Representative Cases," the web site lists the instant case under the sub-heading "OTHER CELEBRATED CASES" with the following text: "**ROGER KHAN** – A Guyanese national, who was kidnapped to the United States by the Drug Enforcement Administration to face major drug charges." (*See* http://www.simelslaw.com/html/case_histories.html.[5]) Although this listing and description does not explicitly state that the case is closed or that there was a victory for Simels, there may be a suggestion, as the press member pointed out, that Simels has already prevailed.

The New York Lawyer's Code of Professional Responsibility is intended to protect the public

---

[4]Last visited July 18, 2007.

[5]Last visited July 18, 2007.

from false, deceptive, and misleading advertisements.[6] Simels is cautioned to carefully review New York's Disciplinary Rules 2-101 and 2-102 and Ethical Consideration 2-10 and comport himself in a manner that adheres to these rules. In addition, as attorney Internet web sites are likely subject to the codes of professional conduct of other states, Simels would do well to ensure he is in compliance with the rules of other states.

## IV. Sealing of Submissions

Both parties have requested that their submissions in regard to this matter be filed under seal. The government's request is granted in part. The unredacted transcript and the CD recording of the April 25, 2007 press conference will be under seal in order to protect the identity of possible witnesses. However, the remainder of the government's submission will not be under seal.

Simels's request to file his submission under seal is denied. To this end, the court notes to both parties that all proceedings in this case are public. Indeed, our Constitution mandates that all criminal proceedings be public. As a general matter, submissions should not be filed under seal. Accordingly, only under extenuating circumstances will this court grant requests to file submissions under seal. The fact that opposing counsel has filed a document under seal does not automatically translate into a need to file any response or reply under seal. Counsel are urged to keep this in mind in order to avoid unnecessary secrecy and paperwork.

---

[6]*See* New York Lawyer's Code of Professional Responsibility Disciplinary Rules 2-101, 2-102; Ethical Considerations 2-10.

## V. Conclusion

For all of the foregoing reasons, the government's motion for an order prohibiting the defendants' attorneys from making statements to the press in violation of Eastern District of New York Local Criminal Rule 23.1 is granted. The court's prohibition, which goes beyond Rule 23.1 and applies to all counsel, is set forth above.

The government's request to file its submission under seal is granted in part and denied in part. Simels' request to file his submission under seal is denied.

SO ORDERED.

DATED:    Brooklyn, New York
          July 19, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge