

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CP:SCJ
F. #2006R00602

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 29, 2009

The Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Shaheed Khan
>      Criminal Docket Nos. 06-255(S-1)(DLI),
>      08-CR-640 (DLI) and 09-CR-150 (DLI)

Dear Judge Irizarry:

The government respectfully writes concerning the sentencing of Shaheed Khan, which is set for October 16, 2009 at 2:00 p.m.

On March 16, 2009, the defendant pled guilty pursuant to a plea agreement to: (1) conspiring to import 5 kilograms or more of cocaine into the United States between January 2001 and June 2006 (06-CR-255 (S-1)(Count Two)); (2) conspiring to obstruct justice between May and September of 2008 (08-CR-640); and (3) being a felon in possession of a firearm on November 29, 1993 (09-CR-150).  Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the plea agreement stipulates that a specific sentence of 15 years imprisonment, five years supervised release, a $300 special assessment, as well as any fine and restitution to be imposed consistent with the applicable statutes, is the appropriate disposition of all three criminal cases.  The defendant also agreed to waive his right to appeal this sentence, and waived his attorney-client privilege with respect to Robert Simels and Arienne Irving.  The government agreed to not bring any additional charges in this district relating to the conduct covered by the plea and, for the narcotics case, dismiss the remaining counts of the superseding indictment and the underlying indictment at sentencing.

The government respectfully requests that the Court sentence the defendant as provided by the plea agreement.  The government further requests that the Court impose a fine as it deems appropriate, but, in any event, not greater than

2

$4,000,000.  21 U.S.C. § 960(b)(1).  This agreed upon sentence is below the applicable sentence of life calculated under the advisory United States Sentencing Guidelines ("Guidelines," "U.S.S.G."), but is justified for the reasons set forth below.

Factual Background

As set forth in the Presentence Investigation Report ("PSR"), on November 29, 1993, the defendant was arrested in the District of Vermont and charged with being a felon in possession of a firearm after he purchased three firearms from a federal agent in exchange for two ounces of marijuana.  PSR ¶¶ 20-21.  After the defendant was released on bail, the defendant fled the United States in early 1994 and returned to his home country of Guyana.  The defendant, while he lived openly in Guyana, remained a fugitive on the gun charge until his arrest in 2006.

After the defendant returned to Guyana in 1994, he worked in the construction industry.  PSR ¶¶ 86, 87.  The defendant told the Probation Department that he was always self-employed in construction. PSR ¶ 86.  The defendant's mother stated that he worked for another construction company and then opened his own construction company in 2002, as well as other businesses.  PSR ¶ 87.  Beginning in or around June 2001 and continuing until his arrest in June 2006, the defendant imported kilogram quantities of cocaine into the United States, including into the Eastern District of New York.  For example, as set forth in the PSR, the government seized a drug ledger which indicated that Devendra Persaud, a Guyanese narcotics trafficker based in Queens, New York, received over 150 kilograms of cocaine from the defendant's narcotics organization in early 2003.  PSR ¶ 7.  Over time, as the defendant's narcotics operation became more profitable, it appears that the defendant became one of the more successful drug traffickers in Guyana. PSR ¶ 6.

After his arrest, the defendant became involved in a conspiracy to obstruct justice.[1]

---

[1] To the extent necessary, facts relating to the offense conduct for the obstruction count will be addressed in a separate submission by the attorneys for the government handling that matter.

3

Argument

I.   LAW REGARDING PLEA AGREEMENTS PURSUANT TO RULE 11(c)(1)(C)

With respect to sentence bargains under Rule 11(c)(1)(C), the advisory Guidelines provide that district courts can accept such agreements if "the agreed sentence departs from the applicable guideline range for justifiable reasons" and do not "undermine the basic purposes of sentencing."  U.S.S.G. § 6B1.2(c).  Since "the phrase 'justifiable reasons' can easily accommodate all of the real-world factors that cause prosecutors and defense counsel to strike sentence bargains," and because "those concerns [have] long been considered legitimate reasons for courts to accept sentence bargains, it [is] easy to conclude that accepting these agreements [does] not 'undermine' any purpose of sentencing, let alone the 'basic' ones."  John Gleeson, The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Policing Sentence Bargains, 36 Hofstra L. Rev. 639, 644 (2008); see also Mary Patrice Brown & Steven E. Bunnell, Negotiating Justice: Prosecutorial Perspectives on Federal Plea Bargaining in the District of Colombia, 43 Am. Crim. L. Rev. 1063, 1071 (2006) (noting that federal prosecutors may agree to a Rule 11(c)(1)(C) plea agreement that stipulates a sentence below the otherwise applicable Guidelines range "based on considerations that are outside the rubric of the Guidelines, such as proof problems, uncertain legal issues [and] competing demands for prosecutorial resources").

The Second Circuit recently has held that sentence bargains pursuant to Rule 11(c)(1)(C) operate outside the sphere of the Sentencing Guidelines, "though the court can and should consult the Guidelines in deciding whether to accept the plea." United States v. Main, --- F.3d ----, 2009 WL 2616251 (2d Cir. Aug. 27, 2009)(quoting United States v. Cieslowski, 410 F.3d 353, 363 (7th Cir. 2005)).  In Main, the Court held that a defendant who had pled guilty to a crack offense was ineligible for a retroactive sentence adjustment provided by law for those sentenced based on a sentencing range subsequently lowered by Sentencing Commission because the defendant's sentenced was "based on" an 11(c)(1)(C) plea agreement and not the Guidelines. 2009 WL 2616251, at *2; see also United States v. Cunavelis, 969 F.2d 1419, 1421-22 (2d Cir. 1992)(court concluded the provisions of U.S.S.G. § 5K1.1 "are simply inapplicable to plea agreements governed by [Rule 11(c)(1)(C)]").

In United States v. Williams, 260 F.3d 160 (2d Cir. 2001), the Second Circuit affirmed Judge Glasser's acceptance of a Rule 11(c)(1)(C) plea agreement that provided for a stipulated

sentence considerably below the applicable Guidelines range. Judge Glasser stated during the plea allocution that although he "would normally explain what the guidelines are all about and what the estimated guidelines in this case might be" he did not do so in that case because it was "superfluous" where the defendant entered into a Rule 11(c)(1)(C) agreement. Id. at 163. Moreover, "Judge Glasser was not required to, and in fact did not," calculate an offense level, "was crystal clear in his belief the Guidelines were irrelevant" and ultimately "made no determination at all as to the guideline sentence that would apply in the absence of a . . . stipulated sentence." Id. at 172 (Haden, J, concurrence); see also United States v. Pimentel, 932 F.2d 1029, 1033-34 (2d Cir. 1991) (rejecting the notion that sentence bargains are "undue or unseemly intrusions on the judicial function" and suggesting that district courts should look favorably on Rule 11(c)(1)(C) plea agreements); United States v. Aguilar, 884 F. Supp. 88, 91-92 (E.D.N.Y. 1995) (noting that pursuant to Rule 11(c)(1)(C), "a large class of defendants may be sentenced outside the Guidelines.").

"Moreover, if there was any doubt whether a court may impose a sentence outside of the Sentencing Guidelines range" pursuant to a Rule 11(c)(1)(C) plea agreement, "that doubt has been erased by the Supreme Court's recent decision in United States v. Booker, 543 U.S. 220 (2005)." United States v. Cieslowski, 410 F.3d 353, 363 (7th Cir. 2005); see also United States v. Kling, 516 F.3d 702, 704 (8th Cir. 2008) (en banc) (holding that "Rule 11(c)(1)(C) plea agreements remain permissible post-Booker"); United States v. Bundy, 359 F. Supp.2d 535, 538 (W.D.Va. 2005) ("After Booker, of course, there can be no reasonable argument that the court does not have the authority to accept an agreed sentence below the guideline range"). Indeed, "Booker actually strengthens the case for the validity of sentences imposed under Rule 11(c)(1)(C) plea agreements that deviate from the Guidelines range." Cieslowski, 410 F.3d at 363.

Under the prevailing Second Circuit case law favoring Rule 11(c)(1)(C) plea agreements, Judge Gleeson's analysis of the utility of such agreements is particularly apt with respect to this case:

> [T]he very same reasons that we grant [prosecutors] the power to decline to prosecute--their expertise in assessing the strength of a case, their interest in best allocating their resources, and their superior ability to weigh the crime control implications of their actions--counsel in

>favor of allowing prosecutors to bargain for lesser sentences. Here's an example from my own experience as a prosecutor: A decision to strike a seven-year sentence bargain with a seventy-year old mobster charged with murder. That bargain reflected a considered judgment about the risk that defendant posed to the community at the time, the risk he would pose when released after such a sentence, and the likelihood that a jury would convict based on the evidence I knew would be presented. Similarly, a sentence bargain that would fend off a long money laundering trial could easily reflect a decision to staff a wiretap with agents who otherwise would be tied up in that trial. These are important crime control and resource allocation decisions, and they are exactly the kinds of decisions we want our prosecutors to make . . . Just like the decision whether or not to charge, the decision what sentence to pursue in plea negotiations is a crime control judgment that prosecutors are best situated to make.

Gleeson, supra, at 655-57 (internal citations omitted).

II.  JUSTIFICATION FOR THE AGREED-UPON SENTENCE IN THIS CASE

The government submits that the Rule 11(c)(1)(C) plea agreement is justified and should be accepted by the Court for two reasons: (1) disposition of this case without the need for a lengthy and costly trial would conserve substantial judicial and government resources; and (2) a trial in this case would entail litigation risks for both the government and the defendant.

A.  Conservation of Judicial and Government Resources

Acceptance of the Rule 11(c)(1)(C) plea agreement saves enormous judicial and prosecutorial resources by eliminating the need for at least one and possibly up to three trials, including a lengthy trial on the narcotics charges encompassing several different narcotics investigations by Immigration and Customs Enforcement ("ICE") and the Drug Enforcement Administration ("DEA"), numerous cooperating witnesses and voluminous wiretap evidence; a second trial regarding the obstruction of justice charges before Judge Gleeson involving a different set of prosecutors and agents than the first trial; and a third trial in the District of Vermont on the gun charge involving the Bureau of

6

Alcohol, Tobacco and Firearms ("ATF").[2]

Disposing of a case through an agreement to dismiss certain charges is within the government's discretion. The Second Circuit repeatedly has noted that "[p]rosecutorial discretion in the decision as to which charges to bring and which to forego, resting on assessments" such as "the government's priorities and overall enforcement plan is . . . integral to the plea-bargaining process." United States v. Bonnet-Grullon, 212 F.3d 692, 701-02 (2d Cir. 2000) (quoting Blackledge v. Allison, 431 U.S. 63, 71 (1977) (recognizing that plea bargaining is an "important component[] of this country's criminal justice system" because, inter alia, it allows "[j]udges and prosecutors to conserve vital and scarce resources")); see also Aguilar, 884 F. Supp. at 91 ("The [Second Circuit] has consistently endorsed the use of plea agreements – including those reached under Rule 11(e)(1)(C) [the predecessor statute to Rule 11(c)(1)(C)] – as essential to the operation of the courts.") (citing United States v. Stanley, 928 F.2d 575, 582 (2d Cir. 1991)).

In fact, the Second Circuit has encouraged prosecutors to "sentence bargain" pursuant to Rule 11(c)(1)(C) in order to avoid "a steady parade of appeals that squander scarce judicial resources and waste the Government lawyers' time." Pimentel, 932 at 1033. For example, in United States v. Williams, the Second Circuit affirmed a decision by Judge Glasser accepting a Rule 11(c)(1)(C) plea agreement as justifiable because it "avoid[ed] a lengthy and costly trial," even though the defendant did not enter the plea until after jury selection was completed. 260 F.3d at 162-63. Notably, the plea agreement provided for a certain prison term of 20 years even though the PSR calculated a mandatory life sentence. Id. at 162. Similarly, in United States v. Aguilar, Judge Weinstein accepted an agreed-upon sentence of 188 months despite an applicable Guidelines range of 360 months to life, in part, because "[h]ad the court been required to impose the Guidelines sentence . . . the system would have been deprived of the benefits of negotiations that resulted in the acceptance of twelve guilty pleas at one time." 884 F. Supp. at 92; see also Bundy, 359 F. Supp.2d at 538-39 (accepting Rule 11(c)(1)(C) plea agreement because "the litigation was protracted and the government had an interest at this point in bringing it to an end").

The plea here results in substantial savings of

---

[2] Of course, if the defendant were convicted at the first trial of the narcotics charges and sentenced to a lengthy term of imprisonment, that might affect the parties' positions regarding disposing of the other two cases by plea or trial.

7

judicial and government resources. As discussed above, the narcotics trial in this case would be lengthy, and two additional trials may follow. Defense counsel made clear that, absent a plea, the defendant would pursue foreign depositions involving still more resources involving potential disputes over the admissibility and relevance of that testimony, as well as a potential rebuttal case by the government.

Thus, accepting the Rule 11(c)(1)(C) plea agreement negotiated between the parties will result in a significant saving of judicial resources.

Moreover, resolution of this matter by plea will conserve tremendous prosecutorial and agency resources. Trial in this case would require the full-time attention of three Assistant U.S. Attorneys and two ICE agents, two additional Assistant U.S. Attorneys and a DEA agent for the obstruction charges, and, after those trials, a District of Vermont Assistant U.S. Attorney would have to dispose of the 1993 gun case with assistance from the ATF. Also, due to potential privilege issues associated with the obstruction of justice charges, not only did the government have to institute various firewall procedures between the teams handling the drug and obstruction charges, a third "privilege" team consisting of two additional Assistant U.S. Attorneys was charged with reviewing documents seized from the office of the defendant's former counsel as part of the obstruction case.

Also, the government anticipated calling numerous cooperating witnesses at the defendant's narcotics trial, many of whom are Guyanese citizens. The government took steps to protect these witnesses from retaliation or intimidation by not disclosing their identities to the extent possible, relocating certain individuals and delaying or avoiding deportations to Guyana. Because the defendant pleaded guilty prior to the exchange of 3500 material or a witness list, the government avoided disclosing the identities of its prospective witnesses or the substance of their testimony. Also, by disposing of this case by a plea, the government has protected information provided by the cooperating witnesses about other targets of the investigation who have not been arrested.

Finally, I am informed by the Assistant U.S. Attorneys who worked on the obstruction case against Robert Simels and Arienne Irving, that by agreeing to waive his attorney-client privilege with these individuals in his plea agreement, the defendant's plea assisted the government conserve both judicial and prosecutorial resources in that case. For example, there

8

were at least ten additional boxes seized from Simels' office relating to the defendant's case which the "privilege team" did not have to review and litigate the applicability of privilege due to the defendant's privilege waiver.

In sum, rejecting the agreed-upon sentence with respect to this defendant would deprive the Court and the government of the benefits of negotiations that resulted in the disposition of multiple, complex and costly criminal prosecutions.

    B.    <u>Litigation Risk</u>

Acceptance of the Rule 11(c)(1)(C) plea agreement is also justified because it fairly accounts for the litigation risks faced by the government and the defendant if the case were to proceed to trial.

Courts consistently have recognized that litigation risk provides ample justification for accepting a sentence negotiated between the government and the defendant, even where that sentence is well below the applicable Guidelines range. <u>See</u>, <u>e.g.</u>, <u>United States v. Goodall</u>, 236 F.3d 700, 703-06 (D.C. Cir. 2001) (recognizing that "proof problems" are a "justifiable reason" for acceptance of a Rule 11(c)(1)(C) plea agreement below the applicable Guidelines range); <u>Bundy</u>, 359 F. Supp.2d at 538-39 (accepting Rule 11(c)(1)(C) plea agreement providing for a more lenient sentence than called for by the Guidelines in light of "the exigencies of plea bargaining from the government's point of view – limited resources and uncertainty of result").

The defendant was brought to the United States to face serious narcotics charges, which could have resulted in a mandatory life sentence if convicted of all charges in the superseding indictment. 06-CR-225 (S-1). The defendant, however, conducted his narcotics business entirely from abroad and, for the most part, insulated himself from direct contact with the recipients of his drugs in this district. While the police in Guyana had seized documents and equipment from locations associated with the defendant, it would have been a challenge to establish the necessary foundation to admit that evidence at the trial or use it to connect the defendant directly to narcotics trafficking.

The most powerful evidence against the defendant in the narcotics case would come from the government's cooperating witnesses, who also tie the defendant to the government's other evidence. Building a case through the use of cooperating witnesses, while often done successfully, is not without risk.

9

Here, the cooperating witnesses were involved in narcotics trafficking and many had extensive criminal histories. While the government has confidence in its evidence of the defendant's guilt beyond a reasonable doubt, it is always possible that a jury could question the testimony of the cooperating witnesses based on their criminal histories. Therefore, this case is not without litigation risk for the government.

The litigation risk to the defendant is equally palpable, as he faces a mandatory life sentence if convicted of all charges at trial and faces a likely life sentence under the advisory Guidelines if convicted of the lesser narcotics conspiracy charges.

While at least one third party has objected to the plea disposition because she believes 15 years is too lenient based on allegations that the defendant was involved in multiple murders or other bad acts in Guyana, the defendant has not been charged with murder in this district. To the extent that the defendant is responsible for other crimes in Guyana, he may face additional charges after he is deported back to Guyana if local law enforcement officials decide that is appropriate.

In sum, the agreed-upon sentence provides an equitable disposition in this case for both the government and the defendant in light of the burdens, uncertainties and risks posed by multiple trials.

10

## Conclusion

For the reasons set forth above, the government respectfully submits that a sentence of 15 years imprisonment is the appropriate sentence in this case.

        Respectfully submitted,

        BENTON J. CAMPBELL
        United States Attorney

By:         /s/
        Shannon C. Jones
        Walter M. Norkin
        James Loonam
        Assistant U.S. Attorneys
        (718) 254-7000

cc:  Diarmuid White, Esq. (by ECF)
    Carol Sewell Rhoden, U.S. Probation Department (by hand)
    Clerk of Court (DLI) (by ECF)